

**EXHIBIT A**

## *Copperleaf Homes*
WE BUILD HOMES AS CUSTOM AS YOUR LIFESTYLE

CONTRACT FOR CONSTRUCTION
(Owner Provides Construction Financing)

| | |
|---|---|
| CONTRACTOR: | Builtrite Builders, LLC, a Colorado Limited Liability Company D/B/A Copperleaf Homes |
| ADDRESS: | 7826 N Academy Blvd<br>Colorado Springs, CO 80920 |
| TELEPHONE: | ███████ |
| FACSIMILE: | ███████ |
| OWNER (S): | Joshua David Morgan |
| CURRENT ADDRESS: | ███████ |
| TELEPHONE: | ███████ |
| EMAIL: | Jmorgan@archconceptsllc.com |

This Contract for Construction ("Contract") is made and entered into as of September 6, 2018, by and between **Builtrite Builders, LLC**, a Colorado limited liability company d/b/a **Copperleaf Homes** ("Contractor"), and Josh Morgan ("Owner").

In consideration of the mutual covenants contained herein, Contractor and Owner agree as follows:

1.      **THE PROJECT**. Contractor agrees to construct for the Owner a single family residence (the "Residence") on real property located at 7875 Lost Lake Drive, Franktown, CO 80116, Douglas County, legally described as Parcel 9, Legacy Pines Exemption (referred to as the "Property" or "Site"), substantially in conformance with this Contract and the drawings, plans and specifications (collectively referred to as the "Contract Documents").

2.      **THE CONTRACT DOCUMENTS**. The rights, duties and obligations of the parties are as set forth in the Contract Documents. If there is any inconsistency among the Contract Documents, the terms of this Contract will prevail over any conflicting provisions in the other Contract Documents.

The Contractor shall perform all of the work that is required by the Contract Documents. In addition to this Contract, the other Contract Documents are as follows:

(a)  Concept plans, which shall be considered attached hereto as <u>Exhibit A</u> and incorporated as part of this Contract.

(b)  Summary of Included Features, which shall be considered, attached hereto as <u>Exhibit B</u> and incorporated as part of this Contract.

(c)  Pricing Summary and Allowances, as set forth in <u>Exhibit C</u>.

(d)  Additional Provisions, as set forth in <u>Exhibit D</u>.

(e)  Mold Disclosures, as set forth in <u>Exhibit E</u>.

(f)  Limited Warranty Agreement and Standards of Construction attached hereto as <u>Exhibit F</u>.

3.    **CONTRACT PRICE**.  Owner agrees to pay for the work completed in the construction of the Residence and the Contractor agrees to construct the Residence for the contract price of <u>$1,113,752.00</u> (the "Contract Price").

(a)    $30,000.00 due upon execution of this Contract (the "Earnest Deposit").  The Contractor shall have no obligation to place the Deposit in escrow, and the Owner acknowledges and agrees that the Contractor does not intend to apply the Deposit to monthly draws due from Owner. Deposit will be applied to the final Contract Price of the Residence.

(b)    Monthly draws will be submitted to Owner or an agent for the Owner by the 10th and 25th of each month with payment due within 5 days of receipt. Draws will be submitted for work performed and materials, including stored materials, supplied during the previous month, as well as profit and overhead for the Contractor. Details of draws (including invoices) are private, between the Contractor and the Bank who is financing. Owner will receive general descriptions and names of payees. Owners agree to fund draws when/as submitted.

(c)    The final payment of the Contract Price shall be due no later than three (3) business days after the Certificate of Occupancy is granted of the construction of the Residence.  At this time all draws and Deposit will be applied to the final Contract Price of the Residence.  The Contractor must receive final payment prior to the Owner occupying the Residence.

(d)    Unless otherwise agreed in a Change Order, payment for Change Order amounts under Paragraph 9 shall be due upon approval of the Change Order by both the Contractor and Owner.

4.    **COMMENCEMENT, COMPLETION, OCCUPANCY & POSSESSION**.

(a)    <u>Commencement of Construction</u>.  The construction of the Residence hereunder shall be commenced by the Contractor promptly after all necessary federal, state and local government permits and approvals are obtained and the Deposit has been received by Contractor.

2

(b)     Delays in Construction.  If Contractor is delayed at any time during the progress of the work by labor disputes, strike, lockouts or any other acts of employees or suppliers of labor or materials over which the Contractor has no control or for which the Contractor is not responsible, or by fire, adverse weather conditions, declarations of war or of national emergencies, civil unrest, force majeure, acts of God, neglect or default of Owner, failure of Owner to meet selection deadlines set forth by Contractor, or by failure or unavailability of materials, adequate sewer, water, electricity, gas, or utility service, or by any cause beyond Contractor's control, the time herein estimated for completion for the Residence shall be extended for a period equal to the time lost by reason of any of the causes aforesaid.  For any delays not the responsibility of Contractor in the completion of the Residence, the Contract Price shall be increased by the difference in Contractor's costs occasioned by such delays, which increases shall be evidenced by a change order from the Contractor to the Owner submitted and approved pursuant to the provisions of Paragraph 9.

(c)     Control During Construction.  Contractor shall have sole control and exclusive possession and unrestricted use of the Site during construction of the Residence until completion of the Residence and payment of all monies due the Contractor.  All communication will be made directly to Contractor.   The Owner shall not issue any directions or instructions to the subcontractors or suppliers concerning the work.  The Owner shall not be permitted to do any of its work on the Property prior to the delivery of possession of the Residence to the Owner unless the Contractor permits such work by the Owner in writing.  If the work done by the Owner or its contractors delays or impedes the work of the Contractor, the Contractor shall have the right to withdraw its approval in which event such work by the Owner or its contractor shall immediately be terminated until possession of the Residence is delivered to the Owner or the Contractor otherwise consents in writing to a continuation of such work by the Owner or its contractor.

(d)     Delivery of Possession to Owner.  Physical possession of the Property shall be provided to Owner upon final payment of the Contract Price and the availability of the Residence for occupancy.

(e)     Dangerous Condition; Visits to the Property by Owner.  The Owner and/or its representatives shall not enter the Residence prior to final payment and delivery of possession to the Owner unless accompanied by a representative of the Contractor.  The Owner understands and agrees that the Property is a construction site and that the Property and Residence constitute a danger to those who may enter the Site.  If the Owner enters the Residence prior to completion of the construction of the Residence without being accompanied by a representative of the Contract, it is understood that Owner does so without Contractor's consent.  If the Owner enters on the Property during construction, whether or not accompanied by a representative of the Contractor, the Owner does so at the Owner's risk, and the Owner hereby releases Contractor and agrees to indemnify, defend and hold Contractor harmless from any and all claims for injury or damage to the person or property of (i) the Owner, (ii) any agent or employee of Owner (other than Contractor and its agents or employees), and/or (iii) any person(s) accompanying Owner.



(f)     No Storage During Construction. The Owner shall not place any personal property or possessions in the Residence prior to delivery of possession of the Residence to the Owner without the prior written permission of the Contractor. Any personal property or possessions of the Owner placed in the Residence shall be at the sole risk of the Owner.

(g)     Substantial Completion. The Residence shall be considered substantially complete when it has been constructed in substantial conformance with the Contract Documents and all inspections or certificates of occupancy required by the building department having jurisdiction over the construction of the Residence as a condition to occupancy of the Residence have been obtained. The Contractor shall obtain all final inspections required by the building department having jurisdiction over the construction of the Residence.

(h)     Punch List. Within 30 days after substantial completion of the Residence (and in all cases prior to delivery of the Residence to Owner), the Owner will prepare with the Contractor a written list of any claimed discrepancies and defects in the work (the "Punch List"). The Contractor will correct any discrepancies and defects in the work that are noted on the Punch List within a reasonable time. The Owner will not delay or withhold final payment on the basis that any of the items listed on the Punch List have not been completed. Any observable discrepancies or defects not noted in Punch List shall be handled in accordance with the terms of Paragraph 14.

(i)     Personal Property. The Residence will include only those appliances, furnishings, and other items of personal property and fixtures specifically included in the Contract Documents. Contractor makes no warranties or representations as to the merchantability or suitability for a particular purpose of such items and fixtures, and conveys all such items in an "AS IS" condition. Contractor will assign to Owner the benefit of all manufacturers' warranties on all personal property or fixtures acquired by Contractor to the extent such warranties are assignable.

5.     **CONSTRUCTION PROCEDURES**. Contractor will be responsible for all construction means, methods, techniques, sequences, and procedures, as well as for coordinating all portions of the construction and for safeguarding the Site, materials and work completed. Contractor will supervise and direct the project work and provide business administration and supervision, furnish the necessary workmen and materials and perform the work in a workmanlike manner according to standard industry practices and in substantial compliance with the applicable building codes. Contractor shall be responsible for complying with all governmental and administrative codes, regulations and procedures applicable in the city or county in which the Property is located for the construction of single family residences as well as all covenants and controls of record governing construction in the subdivision within which the Property is located, Owner will be financially responsible of any such items. The Contractor will assist the Owner in obtaining the approval by the architectural control committee, but the ultimate responsibility for obtaining such approval is that of the Owner. The construction shall be in substantial accordance with the Contract Documents. The Contractor makes no representations or warranties that the construction of the Residence will include features or be like any model homes of the Contractor unless the Contract Documents specifically so provide.

4



6.    **LABOR AND MATERIALS; SELECTIONS.**

(a)    Payment for Labor and Materials.  Unless otherwise specifically noted in this Contract and subject to the timely payment of the Contract Price by the Owner as set forth in Paragraph 3, Contractor shall provide for all labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for the proper execution and completion the construction of the Residence. Owner is responsible for any costs associated with Excavation.

(b)    Selections.  All selections must be made from the colors, or samples provided by the Contractor and at dealers designated by the Contractor or as set forth in Exhibit B and Exhibit C, unless otherwise agreed in writing.  If a specified item of material or equipment shall become unavailable, and if Contractor deems that such unavailability will cause delay in the construction schedule, Contractor shall have the right to substitute material or equipment of comparable quality with the approval of the Owner. If the Owner does not approve the substitution, then the Owner will be responsible for any delays and increased costs of construction that could have been avoided by making the substitution.  Owner acknowledges that in the course of construction of the Residence, certain changes, deviations, or omissions may be necessary because of the requirements of governmental authorities having jurisdiction over the work and Property, suggestions and design changes made by the architect, or particular conditions of the job.  Minor variations are not to be considered out of compliance with the Contract Documents. The Owner acknowledges that it will be necessary for the Owner to make selections of various items during the course of construction, and the Owner hereby covenants with the Contractor that the Owner shall diligently and promptly make such selections within the time frames set forth by Contractor (if any).  If the Owner fails to make such selections in a timely manner, the Contractor shall have the right, but not the obligation, to make such selections for Owner.  Any delays by the Owner in making selections may delay the time of completion and may increase the Contract Price.

7.    **PERMITS AND TESTS.**  Contractor shall secure and pay for all permits, licenses and all other approvals necessary for the proper execution and completion of the construction of the Residence, unless specifically excluded.   All such items shall be included in the costs of construction.  Owner hereby authorizes and appoints Contractor to obtain such permits from applicable governmental agencies and authorizes Contractor to execute applications as agent for Owner and in the Owner's name.  Where necessary, Owner agrees to assist Contractor in obtaining any such permits and licenses by completing all necessary applications and forms.  The Contractor will obtain on behalf of the Owner soil reports on the Site for the construction of the Residence at the expense of the Contractor subject to any allowances.

8.    **TAXES.**  The Owner shall pay when due all real property taxes and taxes imposed upon improvements on the Residence after the date of this Contract.  If applicable, the Owner shall pay any dues owed to a homeowners association.  Contractor shall pay all sales, use and similar taxes on materials used in construction, which are legally enacted at the time bids, are received. Contractor shall pay all contributions, taxes, and assessments on payrolls or other charges under

5

all applicable federal, state, and local laws.

9.    **CHANGE ORDERS**.

(a)    <u>By the Owner</u>.  Owner, without invalidating this Contract, may request changes in the work within the general scope of this Contract consisting of additions, upgrades, deletions, or other revisions, which the Contractor, in its sole discretion, may accept or reject. **The Owner understands and agrees that any changes in the work accepted by Contractor may cause increases in the Contract Price and may increase the time required for completion of the Residence.**  Pricing for the change orders will be determined at the sole discretion of the Contractor and will be based on timing, complexity, and affect on the schedule and scope of work. In all cases, including overages on allowance items, the minimum markup for profit, overhead and supervision will be ten percent (10%) of the total costs of the change order to cover costs, liability and overhead. Some changes, especially those involving change of scope, and/or complex pricing operations may be subject to being priced at a higher margin of 25-35%.   Such change orders shall only be effective when accepted in writing by the Contractor and Owner.  The Contractor shall not be required to accept and implement any change orders requested by the Owner until (i) the Contractor and the Owner have agreed on the price of the change order, its impact on the Contract Price and the manner of the payment of the price of the change order, **and** (ii) the Owner and the Contractor have agreed upon the impact, if any, on the time for completion of the construction of the Residence.

(b)    <u>By the Contractor</u>.  The Contractor will prepare and tender to Owner requests for changes in the work within the general scope of this Contract if there exist: (i) the conditions set forth in Paragraph 4(c) (Delays in Construction); (ii) delays caused by the Owner; (iii) the circumstances described in Paragraphs 6(b) (Selections), 13 (Owner directed Subcontractors and Suppliers) or 20 (Soil Conditions); or (iv) any other provisions of this Contract in which changes to the Contract Price or time for substantial completion are addressed.  The Owner agrees to sign such change orders as submitted by the Contractor, and if the Owner refuses to sign such change orders within three (3) business days, without just cause, the change order shall be deemed accepted by the Owner.

(c)    <u>General</u>.  If a change order results in an increase in the Contract Price, such increase shall be paid by the Owner to the Contractor at the time of the execution of the change order unless otherwise agreed in the change order.  The construction loan amount may not be used for changes unless Owner also modifies the construction loan.  Change orders resulting in a credit to the Owner shall not affect Contractor's supervision and overhead fees and profit.

(d)    <u>Changes in Law or by Building Department</u>.  If any changes to the plans and specifications are necessitated by the requirements of the building department having jurisdiction over the construction of the Residence or the architectural control committee for the subdivision in which the Property is located due to either changes in building codes, legal requirements, or any design guidelines of the architectural control committee, the Owner shall be responsible for

any additional costs in construction caused by such changes and the time for substantial completion of construction will be extended as necessary to accommodate any delays in getting the plans and specifications approved and the additional construction time required by the changes.

10.    **INSURANCE; RISK OF LOSS**.

(a)    Contractor's Insurance.  Prior to final payment, the risk of loss or damage to the Residence and other improvements on the Property shall be that of Contractor.  Contractor shall purchase and maintain all necessary workmen's compensation and employer's liability insurance, commercial general liability insurance and comprehensive automobile liability and standard peril builder's risk insurance as will protect the Residence from claims which may arise out of or result from Contractor's operations under this Contract or by any subcontractor or by anyone directly or indirectly employed by Contractor or a subcontractor.  The limits of the casualty insurance shall be in the full replacement value of the improvements on the Property.  The limits of the liability insurance shall be at least $1,000,000.00 combined single limits.  Certificates of such insurance shall be provided to the Owner upon request from the Owner.

(b)    Owner's Insurance.  Effective on the date that final payment of the Contract Price is due under this Contract, the risk of loss for the Residence and all other improvements to the Property shall pass to the Owner.  Prior to the risk of loss passing to the Owner, the Owner shall purchase and maintain their own public liability insurance on the Property.  The Owner may, at the expense of the Owner, obtain such other insurance, as the Owner deems appropriate.

11.    **INDEMNITY**.  During construction, the Contractor shall indemnify, defend and hold the Owner harmless from any loss, liability, damage, claim, loss, or obligation for damage to person or property caused by the negligence of the Contractor or the subcontractors or suppliers of the Contractor.  Such obligation of indemnity shall not include (i) injury to persons or property that is excluded pursuant to Paragraph 4(f) relating to the entry of the Owner on the Property during construction, or (ii) acts or conduct by the Owner or the contractors, subcontractors, agents, guests, family members or invitees of the Owner.  The Owner shall indemnify, defend and hold the Contractor harmless from any loss, liability, damage, claim, loss, or obligation for damage to person or property caused by the negligence of the Owner or the contractors, subcontractors, agents, guests, family members or invitees of the Owner.

12.    **BINDING EFFECT AND ASSIGNMENT**.  This Contract involves a personal relationship between the Contractor and the Owner.  Neither party hereto may assign any interest in this Contract without the prior written consent of the other party, which consent may be withheld in the sole discretion of the other party.  This shall not preclude Contractor from assigning its right to proceeds or payments from the Owner or granting a security interest in such rights, and shall not preclude the Contractor from hiring subcontractors to perform parts of the work under this Contract.  Subject to such limitations on assignment, this Contract shall be binding upon and shall inure to the benefit of both parties and their respective heirs, personal representatives,



subsequent owners of any interest of any kind or nature in the property, successors and assigns, and/or any other party claiming through the parties hereto.

13.     **SUBCONTRACTORS AND SUPPLIERS**.  Contractor shall be entitled to contract with any subcontractor or any person or entity deemed necessary by Contractor to assist in the completion of the Residence.  The Owner will not have the right to select the subcontractors and suppliers used by the Contractor, and the Contractor shall have the sole and exclusive right to select the subcontractors and suppliers providing labor and materials for the completion of construction.  If the Owner states objection to the use of a particular subcontractor or supplier selected by the Contractor and the Contractor honors the request of the Owner not to use the subcontractor or supplier to whom the Owner objects, any increase in cost caused by a change of the subcontractor or supplier shall be payable by the Owner.

14.     **LIMITED WARRANTY**.  The Contractor's sole warranty to the Owner and as to the Residence is as set forth in the Limited Warranty Agreement attached hereto as <u>Exhibit F</u>. Reference is made to the Limited Warranty Agreement for the specific terms of the warranty. **The Limited Warranty Agreement is a limited warranty for a period of one year.  The limited warranties are the sole and exclusive warranties, and any other warranties, including implied warranties, are expressly disclaimed.  The Owner hereby acknowledges that Owner has read the Limited Warranty Agreement and understands and agrees to the terms thereof.  The Owner further acknowledges that the Contractor has entered into this Contract and established the Contract Price based, in part, upon the terms of the Limited Warranty Agreement, and that but for the limitations of warranties in the Limited Warranty Agreement, the Contractor would not have entered into this Contract at the Contract Price stated herein.**

15.     **DEFAULT; REMEDIES.**

        (a)     <u>Mediation</u>.  Any dispute arising out of or related to this Contract whether in contract, tort or statutory, including any claims arising out of or related, in any way, to the warranties provided pursuant to Paragraph 14, not resolved pursuant to the Limited Warranty Agreement or C.R.S. Section 13-20-803.5, as applicable, shall first be mediated before a mediator jointly selected by the parties.  The costs of the mediation shall be borne equally by Contractor and Owner.  Mediation shall be a condition precedent to arbitrating any dispute.  In the event that mediation is unsuccessful, Contractor or Owner may demand arbitration pursuant to Paragraph 15(c) within thirty (30) calendar days of the date of the mediation.  If Contractor or Owner fails to demand arbitration within the specified time Contractor or Owner shall irrevocably waive any and all right to proceed to arbitration and any and all claims they may have against the other party.

        (b)     <u>Arbitration</u>.  Subject to Paragraph 15(b), any dispute arising out of or related to this Contract whether in contract, tort and/or based upon an alleged statutory violation, including any claims arising out of or related, in any way, to the warranties provided pursuant to Paragraph 14, shall be resolved by arbitration administered by the Judicial Arbiter Group in accordance with the rules of the Colorado Uniform Arbitration Act.  The costs of the arbitration shall be borne equally

by the parties. Any arbitration award may be enforced through entry of judgment by any court having jurisdiction there over. Exclusive venue for any arbitration proceeding shall be in El Paso County, Colorado. The agreement of the parties to submit any dispute to mediation, then arbitration, shall not preclude the Contractor from recording a mechanic's lien against the Property and filing a mechanic's lien foreclosure action in order to perfect Contractor's lien against the Property. After the perfection of such rights under the Colorado mechanic's lien act, the action shall be stayed and the Contractor's claims for payment submitted to arbitration for resolution. Notwithstanding the foregoing, if neither party files a motion to stay the action and compel arbitration within thirty (30) days of when the Owner is served with the Complaint filed, the right to arbitrate the Contractor's claims for payment shall be irrevocably waived.

(c)     Contractor's Remedies. If the Owner is in material default under this Contract, the Contractor shall have the right to terminate this Agreement if the default by the Owner is not cured within seven (7) days after written notice of default from the Contractor to the Owner. In addition to any other remedies available to the Contractor as a result of the default by the Owner, the Contractor shall have the right to recover from the Owner all damages arising out of the default by the Owner, including damages for delay, lost profits, unpaid sums due and owing under this Contract, the right to file, perfect and foreclose on the Property pursuant to the Colorado mechanic's lien act and for such other and further relief as may be available to the Contractor at law or in equity. The Contractor may suspend its performance during any uncured event of default by the Owner, and recover all damages occasioned by such delay in performance.

(d)     Owner's Remedies. If the Contractor is in default under this Contract, the Owner shall provide the Contractor with written notice of said default. If, after seven (7) days, the Contractor has failed to remedy the default, the Owner shall provide the Contractor a second written notice. If after seven (7) days after receipt of the second notice, the Contractor has failed to remedy the default, the Owner may immediately terminate this Contract for said default by providing Contractor a written notice to that effect. When the Owner terminates this Contract for one of the reasons stated above, Owner shall be entitled to the remedies set forth herein.

(e)     **Limitation of Remedies. Each party hereby disclaims and waives any claims for the following remedies and damages for any matters related to this Contract, whether a claim is made on the basis of contract, tort or any other theory or basis at law or in equity: (i) punitive or exemplary damages; (ii) claims for emotional distress or pain and suffering; Owner further agrees that, subject to the other limitations contained herein, Contractor's total liability to Owner shall be limited to, and in no event exceed, the amount of any insurance proceeds actually available with respect to any and all claims, whether in contract, tort or otherwise.**

(f)     Time. Causes of action between the parties to this Agreement arising out of or in any way related to any acts or failures to act shall be deemed to have accrued and the applicable statute of limitations shall commence to run not later that either the Closing date for any acts or failures to act occurring prior to the Closing date or one (1) year from the Closing date for any acts or failures to act after the Closing date.

9

16.    **ENTIRE AGREEMENT.**  This Contract shall constitute the entire agreement between the parties regarding the Residence.  Any prior discussions and verbal agreements between the parties are merged into this Contract, and each party agrees that there are no verbal agreements between the parties that are not expressed herein.  No real estate broker or agent has any authority whatsoever to make any agreements, contracts or other binding commitments on behalf of the Contractor.  No verbal representation or statement shall be deemed a part hereof except as stated herein or unless agreed to in writing.  Any amendment or modification of this Contract shall be in writing and signed by both parties hereto.

17.    **CLEAN-UP.**  Contractor will, at all times, make reasonable efforts to keep the Residence free from waste and other materials caused by the construction work and, upon completion of the work, Contractor shall remove all waste, equipment, and other materials from the Property with the exception of vegetation and leave the Residence in a neat and orderly condition.  Contractor shall control erosion and runoff caused by the excavation and grading of the Site during construction of the Residence. All costs associated with Erosion Control shall be the sole responsibility of the owner.

18.    **SEVERABILITY.**  Should any provisions of this Contract at any time be in conflict with any law, ruling or regulation, and be unenforceable, such provision shall continue in effect only to the extent that it remains valid.  The validity of remaining portions or provisions shall not be affected, and the rights and obligations of the parties shall be construed and enforced as if this Contract did not contain the particular part, term, or provision held to be invalid.

19.    **INFORMATION AND SERVICES REQUIRED OF THE OWNER**.  The Owner shall furnish information and services under the Owner's control with promptness to avoid delay in the orderly progress of the work.  Contractor shall be entitled to rely upon the accuracy and completeness thereof.  Contractor shall not be liable or responsible for errors or omissions in any plans, photos or documents furnished exclusively by the Owner or others representing the Owner.  Owner has examined, has approved and has become familiar with the plans and specifications.

20.    **SOIL CONDITIONS.**  The Contract Price is based upon "normal" soil conditions for foundation and utility installation.  The Contract Price includes as an allowance item the anticipated cost of excavation for the foundation and trenching for utilities based on the assumption that there will not be an unusual amount of rock on the Property and that the soil on the Property will not be expansive or have such other conditions or properties that will require an overdig or installation of piers for the foundation.  If soil conditions are encountered that require additional measures to excavate and install the foundation and utilities, the Owner acknowledges that the allowance will be exceeded and the Contract Price will be increased.  Prior to constructing the foundation, the Contractor will obtain an inspection of the soil and have it tested by a soils engineer who will make recommendations concerning the foundation design and construction. If Owner brings their own Soils or Perc Report, Contractor reserves the right to re-test. Any reports older than one year will not be accepted under any circumstances.



Owner acknowledges that the soils within the State of Colorado may consist of expansive, consolidating and/or low-density materials that can adversely affect the integrity of improvements.  Owner further acknowledges that other geologic hazards, including, but not limited to, avalanches, landslides, rock falls, mudflows, unstable or potentially unstable slopes, seismic effects, radioactivity and/or ground subsidence, may adversely affect the Property and/or Residence.  Contractor makes no warranties or representations of any kind concerning any geologic hazards or soils conditions affecting, or which may affect, the Property and/or Residence.

Owner understands that, despite competent work by a qualified soils engineer and construction generally in conformance with the engineer's recommendations, a risk of potentially severe or complete damage to the Residence due to geologic hazards and/or soils conditions will continue to exist.  Owner knowingly and voluntarily assumes these risks, agrees to hold Contractor completely harmless therefrom and waives and releases any claims against Contractor which may arise in the future as a result of geologic hazards and/or expansive, consolidating and/or low density soils materials.

21.     **GRADING AND DRAINAGE**. The Contractor will establish grading and drainage around the Residence in such a manner as will divert water away from the foundation whether from natural precipitation or from lawn irrigation, Owner is responsible for costs.  The purpose of this is to reduce, to the extent reasonably possible, the amount of water that enters the soils adjacent the foundation.  The Owner will not alter the grading and drainage established by the Contractor, and the Owner will not allow areas within five (5) feet of the foundation to be irrigated nor will the Owner allow planting of any grass within five (5) feet of the foundation.  If the Owner causes or allows changes in the grading or drainage, causes or allows irrigation within five (5) feet of the foundation or causes or allows any grass within five (5) feet of the foundation, the Owner shall be responsible for any damage to the foundation and the Residence that are caused by such changes to the grading or drainage or by allowing grass or irrigation within five (5) feet of the foundation. Excavation includes, but is not limited to: dig, over dig, backfill, electric service and utility laterals, necessary retaining walls, culverts, erosion control track pads, trucking and final grade.

22.     **CONTRACTOR'S DISCLOSURES**.

        (a)     Soils Disclosure.  Contractor shall provide Owner with Special Publication No. 43, as prepared by the Colorado Geological Survey, State of Colorado, Department of Natural Resources, from Contractor relative to soil conditions and the like as required by C.R.S. Section 6-6.5-101 at least fourteen (14) days prior to Closing. The publication does not necessarily represent the view of the Contractor, nor of the engineering company, which has prepared a summary report of the analysis of soil conditions; the publication represents general recommendations for dealing with expansive soils and has been prepared by the State of Colorado.

        (b)     Mold.  As more fully described in the Notice, Disclosure, Disclaimer and Waiver

11

attached hereto as Exhibit E and incorporated herein by reference, whether or not Owner experiences any mold or other biological growth depends largely on how Owner manages and maintains the Residence and Property. Contractor is not responsible for any damages caused by mold or other biological growth that may be associated with or caused by any defects in the construction of the Residence, including but not limited to, property damage, personal injury, loss of income, non-economic losses such as emotional distress and pain and suffering, loss of use, and for diminution in value.

(c)     Radon. The Colorado Department of Health and the United States Environmental Protection Agency ("EPA") have detected elevated levels of naturally occurring radon in structures in the Colorado area. Radon is a colorless, odorless, tasteless radioactive gas produced by the natural breakdown of uranium contained in soils and rocks. High concentrations may result in accumulation of radon in enclosed spaces, such as homes. EPA has raised concerns with respect to adverse effects on human health of long-term exposure to high levels of radon. Owner acknowledges receipt of EPA's publication, "Home Buyer's and Seller's Guide to Radon," March 1993, which discusses issues raised by the presence of radon. Owner shall be solely responsible for conducting such investigations and consulting such experts, as Owner deems appropriate to determine the possible presence of radon in the Residence, on the Property and the advisability of incorporation of radon mitigation measures in the Residence. Owner shall rely solely upon such investigations and consultations and shall be solely responsible for providing any radon mitigation measures the Owner desires or that may be recommended to Owner. **CONTRACTOR OR CONTRACTOR'S AGENTS HAVE MADE NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, CONCERNING THE PRESENCE OR ABSENCE OF RADON IN THE RESIDENCE, THE FITNESS OR SUITABILITY OF THE PROPERTY FOR A PARTICULAR PURPOSE OR THE DESIGN OR CONSTRUCTION TECHNIQUES, IF ANY, THAT CAN BE EMPLOYED TO REDUCE ANY RADON LEVELS IN IMPROVEMENTS BUILT ON THE PROPERTY. CONTRACTOR HEREBY DISCLAIMS, AND OWNER, FOR ITSELF AND ITS SUCCESSORS AND ASSIGNS, HEREBY WAIVES, ANY SUCH WARRANTIES AND ANY OTHER WARRANTIES THAT COULD BE CONSTRUED TO COVER RADON OR OTHER ENVIRONMENTAL POLLUTANTS. OWNER, FOR ITSELF, ITS SUCCESSORS AND ASSIGNS, HEREBY RELEASES CONTRACTOR FROM ANY AND ALL LIABILITY WHATSOEVER WITH RESPECT TO RADON. OWNER FURTHER AGREES TO INDEMNIFY CONTRACTOR AGAINST ALL CLAIMS, LOSSES, COSTS AND LIABILITIES (INCLUDING REASONABLE ATTORNEYS' FEES) RESULTING FROM OR ARISING IN ANY WAY OUT OF THE PRESENCE OF RADON ON THE PROPERTY.**

(d)     Fiberglass Insulation. Fiberglass insulation (also known as glass wool) may be used in the construction of the Residence. The U.S. Department of Health and Human Services produced a report that lists glass wool as a substance "which may be reasonably anticipated to be a carcinogen," but that report merely identities substances selected for further study because of potential risk. The listing of a substance in the report is not an assessment that there is casual connection between glass wool and illness. Owner acknowledges that fiberglass is used in the wall and floor to ceiling assemblies, and waives any claims against Seller, arising as a result of the use of fiberglass insulation.

(e)     Value. No representations or warranties have been made regarding the appraised value or potential of the Residence (including, without limitation, whether the Property and



Residence will retain its value or increase in value or decrease in value).

23.     **NOTICES.** All notices required or permitted under this Contract shall be in writing. Notices shall be either: (i) personally delivered to the recipient; (ii) sent by certified mail return receipt requested; (iii) sent by Federal Express or other reputable overnight courier service; or (iv) sent by facsimile transmission, but only if the sending fax machine provides confirmation of transmission. The appropriate addresses for each party for the receipt of notice are as set forth on page 1 of this Contract.

Notice shall be presumed given in each case as follows: (i) upon personal delivery to the recipient; (ii) upon the earlier of the date of receipt shown on the certified mail return receipt or three (3) business days after deposit in the U.S. Mail if delivery is by certified mail provided that a stamped receipt of deposit is obtained from the U.S. Postal Service; (iii) on the next business day after deposit with Federal Express or the other overnight courier service for delivery as reflected on the delivery service receipt; or (iv) on the date shown on the fax transmission confirmation report. In the case of overnight courier service or certified mail delivery, the sender shall prepay the delivery or postage charge.  If no fax transmission number is shown above, then fax transmission, as a method of giving notice is not permitted.

24.     **CONTRACT CONSTRUCTION**.  The parties acknowledge that each party has reviewed this Contract.  The Owner has had the opportunity to have this Contract reviewed by legal counsel. Any rule of construction by which any ambiguity in the Contract Documents shall be resolved against the drafting party shall not be employed in the interpretation of this Contract or any amendments or exhibits hereto.  The titles to the paragraphs of this Contract are solely for the convenience of the parties, and shall not be used to explain, modify, or aid in the interpretation of the provisions of this Contract.

25.     **GOVERNING LAW**.  This Contract shall be governed by, construed, and enforced with the laws of the State of Colorado.

26.     **MISCELLANEOUS**.  The parties further agree:

        (a)      That all materials left over from construction are the property of the Contractor and not the Owner.

        (b)      That until delivery of possession and final payment, Contractor shall have the right to show the Residence to other prospective clients and customers, and for all such activity, the Contractor shall indemnify Owner against all damages, claims, losses or injuries.

        (c)      The Property is located in a subdivision that is subject to restrictive covenants, the Owner acknowledges receipt of copies of the restrictive covenants for the subdivision in which the Property is located, and that the Property will be subject to the covenants.  The covenants may provide for assessments to be paid by the owner of each lot in the subdivision.  The Owner acknowledges and understands that the Owner will be responsible for the payment of any required assessments to the homeowners association established in the covenants.  The amount

13

of the assessments may be subject to change based upon the determination of the homeowners association as to the financial requirements of the association. The Owner also acknowledges and understands that the construction of improvements on the Property, including the Residence, may require the approval of the architectural control committee (ACC) established under the covenants. Owner also acknowledges that any requirements by an ACC (i.e. roofing, stone, driveways, etc.) are at the cost to the Owner.

      (d)    As part of the consideration to the Contractor in entering into this Contract, the Owner acknowledges and agrees that the Contractor will have the right to take photographs and videos of the Residence and the Property for promotional use by the Contractor.

27.    **EFFECTIVE DATE**.  This Contract shall become effective on the day it is executed by both parties.

We, the undersigned, have read, understand and agree to each of the provisions of this Contract and hereby acknowledge receipt of a copy of this Contract.

OWNER:                               CONTRACTOR:

                                            **Builtrite Builders, LLC**,

Print Name: _Josh Morgan_          a Colorado Limited Liability Company

Signature: _____        D/B/A Copperleaf Homes

Date: _9/6/18_

                                          Print Name: _Timothy R. King_

Print Name: _____        Signature: _Timothy R. ____

Signature: _____        Title: _Exec. V.P._

Date: _____              Date: _9-6-18_



Exhibit "A"
Plans





LOWER LEVEL (EXTERIOR TIER)
1878 SQFT FINISHED
216 SQFT UNFINISHED

NOTES:
1) ADDED WINDOW IN CRAFT
2) ADDED BUILT IN BENCH IN BEDROOM
3) EXPANDED DRY BAR

PROJECT | MORGAN RESIDENCE CONCEPT - REV. 1
DATE | 5/31/18   8.6.18

Copperleaf Homes

16



Exhibit "B"
Included Features







## Copperleaf Homes
## Lifestyle Included Features

### HEALTHY ENVIRONMENTAL FEATURES
- Low VOC Interior Paint
- Whole House Water Purifier Aqua-Pure™
- Whole House Humidifier
- 93% High Efficiency Furnace with Nest Thermostat
- Low-E Argon-Filled Windows
- Exceeding Code on Insulation Standards; R-21 in Walls, R-49 in Ceilings

### INTERIOR
- 15 Hours Concierge Service with Interior Designer
- 9 Ft. Ceilings on Main/Upper Levels and 10 Ft. Foundations in Basement
- Schroll Raised or Modern Panels in Knotty Alder, Maple, Hickory or Oak with 3" Crown Molding in Kitchen, Baths & Laundry. Includes Staggered Height Uppers (36"-42") in Kitchen and 36" Raised Vanities throughout
- Laundry Cabinets w/ Laundry Sink & Quartz or Granite Tops (Per Plan)
- Wood Shelving in Pantry and 4' Wide 5-Stack Shelving in Master Bedroom Closet
- Cabinet Hardware Throughout Home
- Undermount Sinks Throughout Home, Including Laundry
- Kohler Undermount Stainless Steel Kitchen Sink with Disposal
- Kitchen Island with Undermount Prep Sink and Disposal (Per Plan)
- 42" Heat & Glo® Gas Fireplace Options in Great Room w/ Cultured Stone® by Boral® Face - Floor to Ceiling (6' Wide) w/ Painted Mantel
- 8' Tall, Solid Interior Doors Throughout Home – Painted (Per Engineered Plan – Height May Vary Due to Ducting)
- Wrought Iron "Basket & Twist" or "Square" Spindles with Hardwood Railings, Carpet Stringers and Newel Posts
- Crown Molding in Dining Room & Master Bedroom - Painted
- Traditional or Modern Options for Base Molding and Casing - Painted
- Door, Trim, Base Molding, Mantel, & Wood Window Sills in Your Choice of Sherwin Williams ProMar® 200 Latex Paint Colors
- Up to 3 Colors of Interior Paint Standard (Walls, Ceiling & Trim)
- Hand Trowel Drywall Finish Throughout Home
- Bullnose or Square Drywall Corner Bead (Windows and Walls)
- 5-Piece Master Bath (Details in E-Book)
- Euro Glass Shower Door in Master Bathroom; "Semi-Frameless" Shower Doors in other Bathrooms (Per Plan)
- Master Bath 12" x 12" and 12" x 24" Tile choices in Tub and Shower Surrounds with Decorative Inserts
- 6" x 6" Ceramic Tile Tub and Shower Surrounds in other Bathrooms
- Glass or Travertine Full Tile Backsplash in Kitchen and 6" Backsplash in Laundry and Bathrooms
- Quartz or Granite Slab Countertops Throughout Home

### Fixtures
- Schlage "Accent" or "Latitude" Interior Door Hardware in Brushed Nickel, Oil Rubbed Bronze or Chrome
- Bathroom Accessories in Moen Eva or Mira Loma Brushed Nickel, Oil Rubbed Bronze or Chrome
- Kohler Sunward Oval 6' Soaking Tub or Free Standing Soaker Tub in Master Bath (Per Plan)
- Kohler Elongated Water Closets in All Baths

### Flooring
- Engineered Pre-Finished, Hardwood Flooring Foyer, Kitchen and Nook with Wood Floor Vents
- Upgraded Carpet with 1/2" 6 Lb. Pad
- 12" x 24" Tile Floor in Baths and Laundry

### Appliances
- Bosch Appliances or KitchenAid – Stainless Steel, Black, or White:
  - 36" Gas or Electric Cooktop
  - 30" Double Wall Oven
  - Built-In Microwave
  - Stainless Hood (Per Plan)
  - 36" Refrigerator
  - 24" Dishwasher
  - Insinkerator Badger-1 Garbage Disposal in Main and Prep Sink in Kitchen

### Electrical/Lighting/Wiring
- Crestron Home Automation System with Mini iPad
- High-Tech Structured Wiring Package
- Exhaust Fans in All Water Closets
- Customizable Lighting Package (Per Plan)
- Recessed Can Lighting (Per Plan)
- Decora Rocker-Style Light Switches
- 12 Dimmer Switches
- 3 Outlets with USB Ports
- Ceiling Fan Pre-Wire (Fan Not Included) in Master, Family or Living Room

### EXTERIOR
- LaHabra Acrylic Stucco or 25-Year Textured Hardboard Lap Siding (Per Elevation)
- Cultured Stone® by Boral® with Stucco Ledge and Pop Out with Standard Grout (Per Elevation – 500 sqft included standard)
- Hardboard Soffits and Fascia
- Sherwin Williams Acrylic Exterior Paint - Up to 2 Colors of Exterior Paint on Top of Stucco/Siding Color Choice (Doors: Garage & Front, Trim: Pop Outs, Soffit, Fascia & Trim)
- Tamko 50-year Asphalt, Architectural Roof Shingles
- Dual-Pane Single Hung or Slider Vinyl Windows in White, Almond or Adobe with "Low" E Argon-Filled Glass
- Vinyl Grid Windows Front Façade (Per Elevation)
- 3' x 8' Painted Single Therma-Tru Classic Craft Rustic or Smooth Star Fiberglass Front Entry Door with Multi Point Lock
- 8' Raised Panel Insulated Garage Door with Glass Window Detail (2 or 3 Car Per Plan) STD Single 8' x 9', STD Double 8' x 16'
- Garage Door Opener for Each Garage Door with One Keypad Per Home
- Evergrain Composite Decking Wrought Iron Spindles & Rails (Per Plan)

### CONSTRUCTION ELEMENTS
- Full Foundation Under Front Porch (Per Plan)
- 2" x 6" Exterior Walls (except garage)
- Blown-in R-21 Insulation in Exterior Walls; R-49 in Ceilings
- Garage Interior Drywall with Knock-Down Texture, Insulation & Paint. Constructed with 2" x 4" Walls
- 7/16" OSB External Structural Sheathing with WRB-Weather Resistant Barrier on Exterior Walls
- Rockwell™ Window Wells (Per Plan)
- Engineered Foundation & Flooring System
- 4000 PSI Exterior Concrete
- Cross-Linked Polyethylene Plumbing Lines with Water Line for Icemaker
- 2 – 50-Gallon Hot Water Heaters
- Hot Water Recirculation System
- Air Conditioner per Furnace (Per Plan)
- Humidifier per Furnace (Per Plan)

In an effort to constantly improve our product, Copperleaf Homes reserves the right to change features and specifications without notice. Measurements are approximate and may vary.  Homes are built to blueprint specification, which must be referenced for specific measurements. Revised 09.28.17

**Exhibit "C"**
**Pricing Summary**



Base House Pricing
Morgan Family Residence 8.7.18
9/6/18

| | |
|---|---|
| Main Level | 2094 |
| Upper Level | 1508 |
| Lower Level | 2094 |
| Total: | 5696 |

| | |
|---|---|
| Base house including basement | $956,928.00 |
| Walk out with appx 350 sq.ft. deck and stairs to ground | $34,000.00 |
| Add countertop linen cabinet in master bath to be priced with Schroll | INFO |
| 12' bifold door to great room | $14,600.00 |
| Pantry has standard 5 stack shelving | INFO |
| Built in hooks and bench in rear mud room | $1,600.00 |
| Additional buffet cabinets and counters in dining area inc. 8' lower cabs, 5' upper cabs and granite tops | $6,200.00 |
| Future Elevator allowance | N/A |
| Oversized garage 864 sq.ft. included, 1300 on plans | $20,056.00 |
| 14x58 batting cage attached to garage | $43,848.00 |
| No fireplace in master bedroom with stone surround | INFO |
| Built in bench in mud room included | INFO |
| Solid wood wall to work out area | INFO |
| Credit for unfinished areas in basement 216 sq.ft. | $(6,480.00) |
| Metal roof accents on home-400 sq.ft. | $3,200.00 |
| Board and Batten exterior siding 400 sq.ft. | $2,000.00 |
| 1000 sq.ft. of exterior stone included | INFO |
| Dog run tbd | INFO |
| Mud room in basement with 10' upper and lower cabs, counters and built in 5' bench with coat hooks | $8,400.00 |
| Wet bar in basement with 8' lower cabs, 6' upper cabs, counter tops, sink-table by owners | $8,400.00 |
| Total Base House Amount: | $1,092,752.00 |

| **ADDITIONS TO STANDARD ALLOWANCES:** | |
|---|---|
| Additional concrete allowance for long and large driveway | $10,000.00 |
| **Total Added to Standard Allowance Amount:** | $10,000.00 |

| **CUSTOM UPGRADE ALLOWANCES:** | |
|---|---|
| Outdoor kitchen area - ALLOWANCE | $8,000.00 |

| Built in bench in basement bedroom - ALLOWANCE | $3,000.00 |
| **Total Custom Upgrade Allowance Amount:** | $11,000.00 |

| **TOTAL CONTRACT AMOUNT:** | $1,113,752.00 |

**STANDARD INCLUDED ALLOWANCES:**
**Included as a part of above pricing: Allowance costs can vary per site. Any overages of these allowances are the responsibility of the buyer and any allowances that come in under will be credited at the end of the build:**

| Standard Excavation Allowance - includes, but is not limited to: dig, over dig, backfill, electric service and utility laterals, necessary retaining walls, culverts, erosion control track pads, trucking and final grade. | $30,000.00 |
| Standard Lighting Allowance | $10,000.00 |
| Driveway/Walkway/Stoop - Allowance | $8,000.00 |
| Standard Well Allowance (If Applicable) - Based on average well costs, price could vary based on depth needed to hit water source. | $20,500.00 |
| Standard Septic Allowance (If Applicable) - Based on average septic costs, price could vary based on land or if a designed (engineered) system is needed | $18,500.00 |
| Total Standard Allowance Amount: | $87,000.00 |

Responsibilities of purchaser: Any and all HOA fees, developer fees, bank fees, and fire sprinkler or mitigation system if required by the building or fire department. Any cost overage on any and all allowances will be the responsibility of homeowner to pay, in the event that the allowances are not used in full Copperleaf will issue a credit for the difference.

Exhibit "D"
Additional Provisions
(Owner(s) and Contractor to review & initial each box)

Owner(s)/Contactor

20

I/we understand that if something is important to us that it is in writing in this contract. Verbal agreements and discussions are not included as part of this Contract for Construction. Both parties agree to what is in writing.

All changes to the plan or contract will be made in writing or via digital Change Order/Selection in BuilderTrend and will not commence without the signature of both the owner and a Copperleaf representative (or Copperleaf entry in BuilderTrend with digital signature from Owner).

Owners understand that this Contract for Construction may include Allowances. Owners understand that any costs in excess of allowances are the responsibility of the Owner and that the Contractor may include a mark up or profit above the cost of the allowances.

Owners understand that our contract includes a list of standard included features along with a line item list of additional upgraded selections that have been priced as well. And we understand that we are free to add things to our plan as it progresses (selections, square footage, etc.) with the understanding that *all items not included in the list of Copperleaf standards, or in addition to what has been specifically listed and priced in this contract, will be paid for regardless of when (or how) they are added (or discovered) on the contracted plans.* We understand that if it is additional to what has been priced in this contract and we want it, it will be paid for OR removed from the plans.

After signing the contract, plan development occurs. Plan development can take between 30-120 days depending on the complexity of the plan/plan changes and on the number/complexity of the changes. The Owner plays a large role in the length of plan development based on the number of changes and response time for change approvals.

Change order price requests may take 2-3 weeks. Often change order price requests will take less than this, based on the complexity of the request and vendor availability.

Owner and Contractor both have a significant impact on the amount of time that it takes to build the home. Owner(s) understand making changes may take more time and costs to complete the home.

Copperleaf will update the Owners weekly at a set date and time as to progress of the home, required decisions for the upcoming week, and to let them know about the upcoming week's events. Any future timing will be approximate and will change on occasion.

Owners should communicate to Construction Manager or Project Coordinator any concerns they have on the scope of work, but shouldn't direct changes to the trade partners working on the home.

Owners should communicate to the Project Coordinator during the Architectural Process any concerns or changes they have on their plan. Owners should not be in direct communication with Architect without including/cc'ing a representative of Copperleaf Homes.

Owners understand and have had explained to us the Copperleaf draw process and that it will begin shortly after contract in order to complete our house plans and obtain permit.

Owners understand Copperleaf will begin to collect Change Order/Selection Overage Checks on a monthly basis as soon as the contract amount exceeds the Construction Loan and that deposits are applied at the end of build.

21

